Case number 20-1049 Michael K. McNary Petitioner v. Federal Mine Safety and Health Review Commission, et al. Mr. Opgaard for the petitioner, Mr. Bacon for the respondents. Good morning. Good morning, Judge. May it please the court, Mr. Bacon. My name is Tony Opgaard. I'm an attorney for Michael K. McNary. And with me in the virtual courtroom is my co-counsel, Wes Addington. I wanted to start with the issue that the court raised in its order on Friday evening, whether this dispute presents a live case or controversy within the meaning of Article 3 of the U.S. Constitution, including specifically whether McNary's asserted injuries are redressable by the remedies he seeks. And the court cited El Paso Natural Gas Company versus FDRC. And we've read that decision. And we do believe that Mr. McNary has standing in this case, that he has suffered an injury in fact that would be the threats made against him, and that his injury is redressable by the remedies he seeks. And the court also cited the joint appendix at pages 11-13 and 117. And at the beginning of the trial on August 15, 2017, the ALJ asked us what remedies we were seeking in the case. And that set forth in the back and forth between counsel and the court, in which we said that one of the remedies is a fine. The purpose of the Mine Act is to protect the health and safety of miners. And civil money penalties are intended to incentivize the mine operator to comply with the law or disincentivize the operator from violating the law. And this is a 105C3 case. That is, the miner filed his complaint with MSHA. MSHA investigated and declined to prosecute the case. If they had prosecuted, it would be under 105C2. But the Mine Act gives the miner his own right to file his case if MSHA turns it down. And the statute provides, the Mine Act provides, that there has to be a fine for any violation of the act. And that would include discrimination or interference, findings of discrimination or interference. So typically, if the Secretary of Labor files a case on behalf of a miner, and if the ALJ rules that the law was violated, then there's a civil penalty attached. That's actually assessed before the case goes to trial. And the judge has to consider various factors, gravity, negligence, et cetera, in assessing a civil penalty. Under a C3 case, as Mr. McNary has, if we were to prevail in front of the ALJ, then that case would be referred to the Secretary of Labor for an assessment of a civil penalty. We can't assess the civil penalty. It has to be the government. So there would... Is that civil penalty paid to your client or to the U.S. Treasury? To the U.S. Treasury. And the ALJ said at the beginning of the hearing that this plant is no longer producing alumina. And we know it was down to pretty skeletal proof. Can you tell us, at the time you filed your petition for review in this court, your petition for review in this court, was the plant producing alumina? Was the plant operating? I am looking right now to see, Judge, the date of when we filed the petition for review. And if you bear with me for a second, I should be able to get that. Petition for review was filed February 21 of this year. As of February, tell me about the status of the plant and whether Mr. McNary is working there. I assume he's still not working there. No, he was laid off at that point. He was laid off in, I believe, it was 2016. Because this issue was not raised below, either before the ALJ or the commission, or by ALCOA before this court, there hasn't been any fact-finding on it. And I'm going on what my client has told me. When you file a petition for review, you have the burden of establishing an ending in a live controversy. That's just part of your job as a petitioner for review. So if you can just explain to us, Mr. McNary is still not working there. As of February, I understand this plant is getting closed down. But as of February, is this plant still open? My understanding was as of February, yes, it was open. Because it wasn't producing alumina at the time of the ALJ decision. Well, there's a difference, Judge, between a plant being open and whether it's in production. Yes, and I'm asking whether it was producing alumina, which creates the very risk you seek to remedy here. I don't believe it was. But I don't believe it was. I think it was a maintenance crew comprised of management, some hourly workers, and some contractors. And there still would have been miners' reps there. There still would be dangers present, even if it's maintenance. And that's my understanding. Mr. McNary, you said was laid off. Was he still going to the plant as a miners' representative? No, he's not, Judge. I believe, from what we learned from our client this weekend, that the plant is actually shuttered now. And that there is not a maintenance crew at the plant now. It really is closed down, as opposed to being a skeleton crew. All right. When you say there was a maintenance crew there, but nothing was being produced at the plant that you're aware of. I believe that's correct. So a maintenance crew would be to, Mr. Bacon could probably answer this better than I, but to make sure that everything was in working order in case it was brought back into production, to make sure there weren't safety hazards present for those who were there. I'm not sure what the contractors would be doing and the hourly employees if they were all maintenance. It's a rather large plant. You can sort of get an idea from the photos or in the record, like how big the valves are, how big the pumps are, and that's just a minor part of the overall plant. It's a very large operation. You mentioned the remedies. You mentioned the fine, the civil penalty. What other remedies, at least at the petition for review stage, is your client seeking? Well, if there was a finding that Alcoa had violated 105C, we had asked the judge for training to be required in minors' rights, specifically in the rights of representatives of minors for all management personnel at Alcoa. We had asked that the decision be posted sort of like decisions are posted through the NLRB, posting as a standard remedy in 105C cases, and has been for decades, and cease and desist order, which would ask that or order Alcoa to stop threatening minors' reps who raise safety issues with management. And again, those are remedies that are regularly ordered by ALJs. So those are the remedies we seek, the fine, the training, the posting, the cease and desist. And one of the things I'd like to point out, Your Honor, is that in 105C cases involving minors' reps, unless the minor rep has been discharged, they typically do not involve claims for monetary relief. And the remedies that Mr. McNary is seeking before this court on this appeal are the same as the remedies that he was seeking on the day of the trial back in August 2017. We believe it's very important to protect representative of minors from discrimination or interference. Congress created that position to ensure that minors play a role in their own health and safety at the mine. And Congress also specifically stated in the legislative history of the Act that Section 105C protects minors and minors' reps against even subtle forms of discrimination, such as threats of reprisal. So it was recognized by Congress from the beginning that you would have cases where there is no monetary relief. The Mine Act is a make-whole remedy, or 105C is a make-whole remedy. The most a minor can get if he's been fired, he or she's been fired, is reinstatement to their job with back pay and interest. There's no punitive damages. There's no damages for emotional distress. It's a make-whole remedy. And typically in cases involving minors' representatives, there will be no monetary relief. So our request really hasn't changed, Judge. When we read the El Paso case, it cited the Supreme Court case of Lujan v. Defenders of Wildlife. And in that case, Justice Scalia said that there are three elements necessary to confer constitutional standing. And that is injury in fact, the same thing that El Paso says, which he said is a violation of a legally protected interest, which is concrete and particularized. In other words, it's not speculative and it's not hypothetical. Number two is a causal connection between the injury and the conduct complained of, which we have here. We have a threat. That's the injury. And number three, it must be likely as opposed to speculative that the injury will be addressed by a favorable decision. And we believe under Lujan, we also have all three elements necessary for constitutional standing. And we believe that under El Paso, we have the same. We've met the requirements, particularly that it's not speculative. We're not saying something could happen down the road. We're saying Mr. McNary was threatened. He was threatened three times. And that is a concrete entry. And we believe it is redressable by by the court. If if I can turn to the merits of the case, a couple of points we wanted to make is first, that Emsha issued two citations or orders to Alcoa the day after the incident between Mr. McNary and Mr. Emig on January 8, 2014. And in this in the order that Emsha issued, they said specifically mentioned Mr. Emig said that safe access to the pumps where they were trying to receive receive the valve had not been provided. And Mr. Emig had engaged in aggravated conduct and failing to provide safe access. And although McNary had complained to Mr. Emig about sending workers into that area or at the least allowing them to go into that area, the judge found that that wasn't protected activity, which really turns case law 105 on its head over the years.  Was that Alcoa failed to properly train the miners in the event that the pump valve failed? So the judge found that these citations were not material, that they were immaterial to the case, as if he was viewing them in a vacuum where Emsha here you have neutral arbiters, they're inspectors going to the mine to protect the health and safety of miners. They essentially agreed with Mr. McNary's complaints to Mr. Emig that you're acting recklessly in sending these miners into a dangerous area. And the judge also found it irrelevant in his analysis that miners had been burned at this plant before. The same thing that Mr. McNary was complaining about that day. He had been burned by that same slurry a couple of years before, and he was burned over 30 percent of his body. He spent time in a burn center a month and he was off of work for about a year. But even closer to the incident, just four months before the incident in question, back in September of 2013, another miner, Mike Brown, was burned again in the in the digestion unit, and he was burned over 60 percent of his body and spent a considerable period of time in a burn center. Mr. McNary. The inspector even referenced those prior incidents when he was having his vigorous discussion with Mr. Emig, am I right? He did mention the Brown incident. He said, what are you guys doing? You had a guy who was just seriously burned a few months ago. And he pointed to the miners wearing the tie cam suits and said, those are the guys you should be concerned about. Not producing more alumina. And another issue, your honors, is that. I'm sorry, I lost my train of thought here. Well, the court found that Mr. McNary had not been threatened because he was a miners rep or in his status as a miners rep, that he had been threatened in his status as an employee. However, when Mr. Emig was asked about that on cross examination, he could not identify a single thing that Mr. McNary had done or any conduct he had engaged in or supposedly was insubordinate, other than the fact that Mr. McNary supposedly told him there'll be a group of people coming to assess the situation. That's all Mr. Emig could identify. Mr. Emig also said that Mr. McNary had said, I don't you can't tell me what to do. Or words to that effect, at least in my capacity as a miners. I don't have to listen to you was his testimony. That seemed to be what the ALJ was focused on. So talk to me about why that what we should do about that, given our definition. Yes, your honor. First of all, the ALJ had several variations of what Mr. McNary had supposedly said. He didn't just confine it to I don't have to listen to you. And certainly Alcoa in their brief has not confined it to I don't have to listen to you. But our position is that a miners rep does not have to listen to a supervisor's evaluation of a danger. And that goes back to the D.C. Circuit's decision in the Phillips case, which was one of the seminal cases under 105 C, where the court said it's clear beyond per adventure that a minor does not have to accept a foreman's evaluation of a safety danger. That's the whole purpose of a miners rep. Mr. McNary was representing other miners at the plant. He's supposed to raise issues having to do with safety and health with supervisors. Also has the right to travel with inspectors. So when when he tells Mr. Emig that you shouldn't have sent the miners into that situation and I've called the health and safety manager, she should be on her way to help assess the situation. That's when it escalated. And there's dispute between what Mr. Emig said and McNary. But really, when you compare the the testimony, they're not that different. Mr. Emig basically said, I call the shots. I make the decisions, not you. And. When Miss Cronus, the health and safety manager, came to this to the site, then Mr. McNary was not involved in conversations with her. He was standing to the side by that point. But he he our belief is that he has that right to say you shouldn't have sent workers into this area. He has the right to to call a supervisor to come to help with the situation to help protect those miners. And another critical point is that Mr. Emig admitted in his testimony that he knew Mr. McNary was concerned for the safety of the miners. He wasn't questioning that. The court also the ALJ also found, and we believe this violates the case law under 105 C, that because Mr. McNary did not invoke this, quote unquote, stop job policy, that that stripped him of the protection of 105 C. And the stop job policy was supposedly any minor at the site had the unfettered right to shut down the operation if if they thought something was unsafe. And there was testimony about that at the trial. And curiously, the judge found that because Mr. McNary just complained about the hazardous conditions, but didn't invoke the stop job policy, that somehow he loses the protection of the act, almost as if the judge was questioning his good faith, although he didn't come right out and say that. And the interesting thing about that stop job policy, though, is there was testimony that after Mr. McNary and Mr. Emig had their argument, Mr. McNary was standing to the side. At that point, there was conversation between Mr. Emig, Carlos Delgado, who was the lead miners rep at the mine, Kelly Gronus, the health and safety manager who had showed up and Brett Baric, the inspection inspector. And the four of them were discussing. And Mr. Delgado basically said what Mr. McNary had said. You're not sending anybody else back into that dangerous area. Now, according to the judge, Mr. supposedly Mr. Emig was very respectful of Delgado's opinion and it didn't get heated. But that contradicts Carlos Delgado's testimony. He said it got heated. Mr. Mr. Emig didn't like to be contradicted. He was the boss and he wanted to run the show. And when Delgado said to him, you're not sending somebody back into that area, i.e., to me, that's a stop job policy. Emig flatly ruled that out and said, we have to access that valve. The only way we can do it is sending people in there. I'm not shutting down the plant. Now, whether or not there's issues involving safety about shutting down the plant is sort of beside the point. Mr. Delgado was saying you're not going to send anybody in there, i.e., you're going to shut down the plant. And that was rejected by Mr. Emig out of hand. But nonetheless, the judge found, because Mr. McNary did not try to shut down the plant, that he lost the protection of 105C. All right. So these are arguments as to why abuse of discretion or clear error, correct? Correct. All right. So why don't we hear from counsel for Fonda? Thank you, Judge. It please the court. Mr. Elk regard. I'm Christopher Bacon, and I represent Alcoa. I'd like to begin with the issue about the jurisdictional issue that the court raised in his order on Friday afternoon. When this case was tried in 2017, I think it was in a very different posture because the Alcoa plant had temporarily closed down. But at the time, I think there was an expectation or a hope that at some point the price of bauxite would be such where they could start up again. And that would probably I think at that point, there was probably even a potential for Mr. McNary himself to be recalled under his union contract. Throughout 2017, 2018 and 2019, there was a skeleton crew and the case, the plant continued to be under the jurisdiction of MSHA. And so MSHA, because one of the things that MSHA has to do when you have a surface mine, they would still come in and do their twice a year wall to wall inspections. Occasionally they would even issue citations. So there certainly was a reason that at this case, if they were still in that posture of the possibility of reopening again, I think it certainly made sense to say, you know, at some point, there could be a remedy for Mr. McNary. In December of 2019 Alcoa announced that it was permanently shutting down the facility and that they would not reopen the facility again. In January, shortly before this petition was filed, MSHA deactivated this mine and informed Alcoa that it was no longer going to be under MSHA's jurisdiction and that going forward, they would be under the jurisdiction of OSHA. And you can actually, if you were to go to MSHA's website, you wouldn't find the Alcoa Point Comfort Facility listed. All existing active mines in the country are listed on the MSHA website. And at least since January of this year, the Alcoa facility has not been an MSHA facility. So in the event that, you know, this case were to be sent back at this point, I don't believe that MSHA would have the jurisdiction to come in, for example, and post a notice. And if anybody was going to be training anybody, if anybody was going to be carrying this, you know, doing any safety work, it would be OSHA and not MSHA. So I do think that today there really is a question as to whether this court really would have jurisdiction over this case. I'm not sure that was the case back in 2017. Well, Article 3 doesn't apply to agencies. So is the plant still open now? My understanding is that they're trying to sell the plant. So there are some people there, but the plant is closed. Not functioning. It's not producing. The plant has not been producing since 2016. And it was not producing at the time that this case was tried. But at the time, it was temporarily shuttered. And so there was, you know, there was a crew of probably 100 people doing maintenance and things like that. The statement by MSHA in January of this year that it was deactivating the mine that was no longer going to be under its jurisdiction. Is that a public statement, a record, or something that you document that you could send to us? No, they actually never did. They verbally communicated that to ALCOA, and then they removed ALCOA from the MSHA website. But they were simply informed by the inspectors from the San Antonio office that typically inspected that plant, that they were no longer going to be inspecting that plant, and it was no longer going to be an MSHA-covered plant. So it was simply a verbal communication. The only proof of it is that it was removed from the website. The person to whom that verbal communication was made, someone who could submit a declaration to that effect? That person could do that, yes. That's the current plant manager who's overseeing the plant at this point, yes. Okay, and that was, you said, January 2020, so before the petition for review was filed. That is correct. All right. And then let me, I think, may I briefly address the merits of the time that is remaining? You know, as we pointed out in our brief, I mean, there really is and there was a difference in version of events from Mr. Emick's perspective and from Mr. McNary's perspective. The judge, the ALJ in this case, believed Mr. Emick. And he didn't just simply say, I find Mr. Emick credible and I did not find Mr. McNary credible. He actually offered an analysis as to why he reached those credibility determinants. What substantial evidence, I need substantial evidence, is there to support the proposition that Mr. McNary went from being concerned about the miners, as the ALJ specifically found, to simply wanting to have some kind of power coup and take over handling of the crisis? What substantial evidence is there? All I see the ALJ citing is that exchange where he said, you can't tell me what to do. And they said, what, as an employer or as a miners rep? And he said, as a miners rep. All right, so what substantial evidence, it strikes me as crazy to think that. I think there was two facts, though. I think the first one is, which Mr. McNary did not admit to, but which Mr. Emick testified in the court believed, which was Mr. Emick got upset because he, Mr. McNary says, I do not have to listen to you. I do not have to listen to you in my capacity as MSHA rep. Mr. Emick said, yes, you do. He said, no, I don't. But he doesn't MSHA rep. You would agree that he doesn't have to listen to him in his capacity. He's not his supervisor as a MSHA rep. Not as an MSHA rep. But another fact that Mr. Emick testified and also Mr. McNary admitted upon cross-examination is, after he was asked by Mr. Delgado to step aside, and Mr. Delgado and Mr. Emick and the MSHA inspector were talking about what was the best strategy to contain this crisis. Mr. McNary came back and inserted himself in that conversation and said, he started to complain about being sent on a wild goose chase. You know, here again, he was. That was a complaint about what was happening with the minors being sent in or allowed to go in, but being dressed up by Mr. Emick to go in. Mr. Emick was dressing him up looking for duct tape. All right. All right, to send them to at least as a supervisor to allow them to go in there. I don't see any evidence of that insubordination. That's this very protected activity. I don't know how that's not protected activity. Well, I think the minors rep, you can come in and go look here. I don't know what he's telling you now, but here's what happened. He was wanting to send a minor, get minors dressed to go in there. Well, I think the ALJ looked at it all, I think, sort of, again, in the totality of the circumstances. You know, this ALJ must have had, like, a function where he could say totality of the circumstances as many times as he wanted in that opinion. But this opinion, I don't see any substantial evidence for concluding that Mr. McNary, who was engaged in protected activity, in contacting Ms. Grone. Ms. Grone said it was appropriate for him to contact her, who was concerned about minors either being sent in or allowed to go in. Misha itself found that he, Mr. Emig, was not, was violating safety rules and how he handled this situation and put minors at risk. And then he comes in and whatever led to this statement that you're, I'm not going to do what you say as a minors rep, that's not insubordination. I see no evidence of insubordination other than this ALJ saying, you know, and trying to invoke these sort of magic words and clear error is a very hard standard. Abuse of discretion is a very hard standard, but it doesn't mean that we close our eyes to reality. And there's nothing to support insubordination in this record. Of course, in an interference case, the question before the ALJ is, is or did what Mr. Emig did end up chilling his right or his desire to later make complaints? And I think that, you know, the fact that Mr. McNary was still, even after he had been asked to step aside, was still extremely confident to come in and interfere in the discussion. He thinks he's just been told he's going to be removed as a minors rep. He's going to be removed from the whole workplace. That's not confident. He's worried. He's upset and worried. And the ALJ was very solicitous of Mr. Emig being upset in this situation. But this seems to me exactly the heat of the moment when minor safety is at risk, when the MSHA representative is upset and yelling. Mr. Delgado is upset and debating. This is exactly the time when you want minors to step up. I'm worried about the proposition here that in the heat of an acute safety crisis, it's okay for supervisors to make serious threats against protected activity like they did because it was a stressful situation for the supervisor. But that seemed to be the ALJ's rationale that Mr. McNary should have said, I see you're under a lot of stress. Let me just go over here and be quiet. But, you know, Mr. McNary, you know, shortly after this, you know, this was again something that occurred in a matter of minutes, a very high stress situation. Why doesn't that count in favor? And Mr. Emig himself admitted that he lost his temper inappropriately and he did testify to that. But within a matter of a short period of time, I'm sorry. He admitted he made those threats. Yeah, he admitted he made those comments. And I think my recollection in his testimony, he wasn't proud that he had made those threats. But in a matter of moments, Mr. McNary, he was part of the post-accident investigation. He went back and wrote down his statement. He was part of the investigation, the post-accident investigation. How did he know he wasn't going to get fired? Maybe they're not going to do it while the MISHA inspector is there on premises. But how did he know he wasn't, at that moment, how did he know? He certainly didn't act like someone who... That's exactly what we rejected in Wilson. But in this particular case, he definitely showed confidence to keep on asserting his... That's exactly what we rejected in Wilson. Yeah, I think that... A reasonable minor, reasonable minor or minor rep, we'll just say a reasonable minor, who's trying to raise safety concerns in the heat of a crisis. And is told by someone who's not, as you said, not proud of what he did, that you're going to be fired, you're going to be removed from this plant, removed from your position, right when we most need safety voices to be loud. Tell me again how that is insubordinate. Well, I think that he was primarily focusing on his... Really, he turned this into a power struggle at a time... Power struggle, that's what he had to do because Mr. Emig was allowing people to go in. If that's what you mean by power... I mean, I'm really thinking about future cases, how we could possibly write an opinion that would say it's okay for a supervisor to make the ultimate threat against an employee in the heat of a safety crisis. Because that person raised safety concerns, engaged in protected activity, and said, you can't tell me not to do that, can't tell me what to do as a minor rep. We're going to have a heat of the moment exception? Well, I think what you have to do in that particular case is evaluate how long this took place, what happened immediately before, what happened immediately afterwards. I mean, you know, the fact is in every workplace, mines and any other type of workplace, people sometimes lose their cool. People sometimes say something inappropriate. And so the question becomes, you know, does this have an enduring effect on the people that are there? Is enduring effect a factor for interference? I think it's how would a reasonable minor react to this? I mean, this was someone who, you know, the testimony from Mr. Delgado admitted that, you know, this was a company which actually the safety manager, the plant manager was very, they were all very accessible to the minors reps. The minors reps frequently engaged in very robust discussions, you know, over safety issues with the minors reps. You know, these were these people were comfortable speaking. Mr. Emick shouldn't have gotten upset that he contacted, had someone contact Ms. Grones. Well, Mr. But see, that's, that's what the judge did not believe. The judge did. First of all, Mr. Mr. Emick's testimony was he had already contacted Ms. Grones and she was on the way. I understand that, which is all the more right. I understand. It doesn't mean in your in the ALJs power play theory here. Mr. The whole fear. The whole theory was that he was upset that Mr. McNary had done it and was trying to bring people in to consult on the process. Part of part of Mr. McNary's problem was that the judge actually did not believe he was being completely truthful about what happened. And, you know, if someone is not being truthful when they're testifying and they said, I credit. I credit Mr. Emick's version of events, but Mr. Emick's version was that was that you can't tell me what to do. And they clarified as a minors rep. You know, he, he, he also had, he did not believe his testimony about the affidavits that he produced. And the testimony is Mr. Emick's testimony was distinct from Mr. McNary, they told a different story. Mr. McNary, Mr. Emick did not say he got upset because Mr. Emick's testimony. I still see no substantial evidence of insubordination. I'm having trouble identifying it and I'm very worried about this, the ALJs reasoning that it's the heat of a safety crisis. That's when we let supervisors explode with threats of termination. That somehow that's what the act allows. But there again, you're looking at a very, again, a very short period of time and are, you know, is that going to have a long term deterrent effect? What happened in just a short period of time? Firing only takes a second. But he never was fired. He was never even, he never even left the area. Right. That may well go to your discrimination claim, but I'm talking about interference. There's not a discrimination claim because, I mean, he didn't, there wasn't an adverse employment action, but, but I think, I think you do have to, you know, otherwise, you know, just any outburst will support an interference claim. And I think you have to look at outbursts, even inappropriate outbursts in the context. This was not just any outburst. He was even by the ALJ's version of events upset that higher management had been called in to assess the situation, and that he had said, I don't have to do what you tell me to do as minors rep. That's not just any, and he was so upset, stressed out that he threatened him with termination. That's not just any outburst. We have to, let's be clear here. All right, that's not just any outburst. That is absent characterization as insubordination, that is a signature violation of the rights to engage in protective activity. It's only by trying to recharacterize everything as ALJ did of insubordination, that's what's critical, as far as I'm concerned, that you're able to say that's anything other than the poster child for retaliation for protective activity. And so that's why I keep asking about what other evidence there was to support insubordination, but I don't mean to beat a dead horse here. I think I think I understand your answer at this point. All right. Anything further? No. Does the court want us to submit an affidavit from the plant manager regarding the closure? I would like to see it, if it's okay with my colleagues. Good. All right, fine. Thank you. Fine with me. All right. So, all right. Counsel for petitioner, anything further? Yes, Judge, we'd like to make three quick points, if we could. Number one, on the merits of the case, Mr. Bacon said that Mr. McNary had reinserted himself back into the conversation. This is when he said he just threatened me. Speaking of Emig, we just want to point out that if he, in fact, reinserted himself, it was already after Mr. Emig had threatened him, had committed the violation, in our view, of 105C. In our brief, our initial brief on page 16, footnote 16, we said that we cited the case of Secretary of Labor on behalf of Dunmire and Estill versus Northern Coal Company, where the commission said that the key to evaluating communication issues between management and miners is what the plain meaning of the words would convey to any reasonable miner. I should have cited another case there, if the court would allow me to cite it now. There is a case, Secretary of Labor on behalf of Gray versus Northstar Mining and Brumit, 21FMSHRC1, 2005 case. In that case, the commission said that when there's communication, if there's a threat from a supervisor to a miner, the issue is not what the supervisor intended, but how it was perceived by the miner. That's what the court has to look at. The final point I wanted to make, going to the issue of outstanding, is that... That's 21FMSH... 27FMSHRC1, page 1, 2005. Thank you. And the third point? And the third point was going back to the standing issue. Posting might be difficult at this point, because if the plant is shut down, but we do believe that posting... Alcoa World Illumina still exists. Of course, we... Just looking at Dun & Bradstreet, they said that they have about 1,000 employees at this time, expected sales in 2020 of a billion dollars. And I believe the number was 132 associated companies in their corporate family. And we believe that a cease and desist order and a training order could go to management of Alcoa, not just people at this plant. Also, Mr. Emig could be ordered to undergo management training. I don't know, and Mr. Bacon may, whether or not he is still employed by Alcoa World Illumina. The point I'm making is that Alcoa World Illumina still exists, even if the plant, the Point Comfort plant where Mr. McNary worked is shut down. All right, fine. We will take the case under advisement. Thank you very much, counsel.
judges: Rogers, Millett, Wilkins